IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CYNTHIA PHILLIPS
    *Plaintiff*,

    v.

RAYTHEON APPLIED SIGNAL
TECHNOLOGY, INC.,
    *Defendant*.[1]

Civil Action No. ELH-11-3230

## MEMORANDUM OPINION

Cynthia Phillips, plaintiff, filed suit against Raytheon Applied Signal Technology, Inc. ("Raytheon"), defendant, alleging unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964, codified, as amended, at 42 U.S.C. §§ 2000e *et seq.*, and violation of the Family Medical Leave Act ("FMLA"), codified at 29 U.S.C. §§ 2601 *et. seq.*[2] In particular, Phillips alleges that she was discriminated against on the basis of race and gender (Counts I and II); that she was subjected to a hostile work environment on the basis of race and gender (Counts III and IV); that she was terminated in retaliation for filing a complaint with the company's Human Resources ("HR") department concerning discrimination and harassment (Count V); and that Raytheon violated plaintiff's rights under the FMLA by failing to reinstate her after she took a medical leave of absence (Count VI).

At the conclusion of discovery, Raytheon moved for summary judgment ("Motion," ECF 44) and filed a supporting memorandum ("Memo," ECF 44-1) as well as voluminous exhibits.

---

[1] Plaintiff sued Applied Signal Technology, Inc. in September 2011, but in January 2011 the defendant's name was changed to Raytheon Applied Signal Technology, Inc.

[2] Suit was filed in the Circuit Court for Anne Arundel County, but Raytheon removed it to federal court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(a). Plaintiff filed a "First Amended Complaint" in May 2012 (ECF 31), which is the operative complaint. Hereinafter, all references to the "Complaint" refer to the First Amended Complaint, unless otherwise noted.

Plaintiff opposed the Motion ("Opposition" or "Opp.," ECF 47), supported by numerous exhibits, and Raytheon replied ("Reply," ECF 48).[3]  The Motion has been fully briefed, and no hearing is necessary to resolve it.  *See* Local Rule 105.6.  For the reasons that follow, I will grant the Motion.

## Factual Background[4]

### A. Phillips' Employment with Raytheon

Raytheon is a government contractor that develops computer software and hardware for defense, intelligence, surveillance, and reconnaissance applications.  Declaration of Steve Campbell, Wireless Systems Director at Raytheon ("Campbell Decl.," ECF 44-42) ¶¶ 2–4.  One such contract between Raytheon and the United States Government was the code-named "Tahoe" Project.  *Id.* at ¶¶ 6–7.  The Tahoe Project was comprised of nine platforms, or systems, that were similarly code-named after California lakes, including Shasta, Emerald, and Blue Water.  *Id.* at ¶ 7.  Raytheon's Wireless Communications Systems Division was primarily responsible for the Tahoe Project.  *Id.* at ¶ 8.

On April 10, 2007, Raytheon hired Phillips, an African-American female, into the Wireless Communications Systems Division to perform software testing on the Tahoe Project.  Am. Compl. ¶ 1.  She remained at Raytheon for approximately 21 months, working primarily on

---

[3] When suit was filed, and throughout the briefing of the Motion, Phillips was represented by counsel.  However, she is now self-represented.  *See* ECF 49, 50, 51.

[4] The facts are undisputed, unless otherwise noted.  As required, the facts, and reasonable inferences drawn from them, are construed in the light most favorable to plaintiff.  *See* Standard of Review, *infra*.

two platforms, Shasta and Blue Water.  *See* Phillips Timesheet, Ex. A to Campbell Decl.[5]

Raytheon planned for Phillips to conduct work on the Emerald platform.  Campbell Decl. ¶ 11.

At the time of her hiring, Phillips' direct supervisor was Peter Robinson, the Section Manager for the Systems Engineering Group.  *See* 2007 Organizational Chart, Mot. Ex.10 (ECF 44-12) at 1; Deposition of Cynthia Phillips ("Phillips Dep.") at 56:8–11.  Robinson reported to Matthew Cottrell, the Manager of the Systems Development Department, and Cottrell reported to Joe Leonelli, the Manager of the Wireless Communication Systems Division.  *See* 2007 Organizational Chart.  However, Phillips' day-to-day work was supervised by Bob Hinckley, who served as an intermediary between the software testers and Robinson.  *See* Deposition of Matthew Cottrell ("Cottrell Dep.") at 11:20–12:20.

### B. Phillips' Interactions with Bob Hinckley

Phillips alleges that throughout her employment at Raytheon, she was harassed and discriminated against on the basis of her race and gender.  Further, she alleges that Raytheon failed to "timely and effectively address the discriminatory acts of Bob Hinckley" and that management participated "in the discriminatory conduct toward the plaintiff."  Am. Compl. ¶¶ 33, 36, 38, 40.

According to plaintiff, the first instance of harassment took place between April and June 2007, when Hinckley allegedly told Phillips that "some men think that [she is] a bitch."  Phillips

---

[5] During her 21 months of employment, Phillips billed approximately 37% of her time to Blue Water, 22% to Shasta, 3% to other projects, and 38% to sick time, personal leave, holidays, and vacation.  *See* Phillips Timesheet.

Dep. at 128:6–129:10; *see also* Phillips Chart, Mot. Ex. 21 (ECF 44-23) at 2.[6]  At his deposition,

Hinckley denied using such pejorative language, but acknowledged that he had informed Phillips

that others were "irritated" with her because she arrived to a worksite three hours late.

Deposition of Robert Hinckley ("Hinckley Dep.") at 22:6–23:18.  Phillips also alleges that on

four occasions between April and June 2007, Hinckley referred to her as "stupid, ignorant, or

dumb."  Phillips Chart at 2.  Each time, according to Phillips, she would "call him aside" and

"tell him not to do it again."  Phillips Dep. at 132:2–134:17.  Hinckley denies making any of the

statements.  Hinckley Dep. at 25:8–12.

On September 21, 2007, Phillips met with Julie Mallam, a Raytheon HR employee.  She

explained that she felt she was "working in a good-old-boys club," and asked Mallam for advice.

Phillips Dep. at 140:10–142:18; Phillips Chart at 3.  Phillips did not file a formal complaint,

however.  Phillips Dep. at 142:16.  According to Phillips, Hinckley later told her that he knew

about her meeting with Mallam and that any further complaints would "get back to him."

Phillips Dep. at 141:11–21; Phillips Chart at 3.

Phillips also alleges two separate incidents of discrimination on October 2, 2007.  As to

one, she alleges that Hinckley told her that she was "overpaid."  Phillips Chart at 3; *see also*

Affidavit of Cynthia Phillips ("Phillips Aff.," ECF 47-1) ¶ 5.  Phillips testified at her deposition

that she believed Hinckley "was trying to insult" her because he was "upset" about "an incident."

Phillips Dep. at 146:4–12.  Hinckley denies making the statement.  Hinckley Dep. at 25:16–19;

35:19–36:4.  As to the other, Phillips claims that she found hidden in the bottom of a drawer a

---

[6] Plaintiff recorded each incident of alleged abuse on a chart she titled "Chronicle of abuse at AST."  Throughout her deposition, Phillips repeatedly affirmed that she created the Chart and that it accurately reflects her allegations.  *See, e.g.*, Phillips Dep. at 140:10–141:2.

"key document" relating to a "pager system" that she had requested from Hinckley. Phillips Chart at 3. When asked what led her to believe that it had been hidden from her, Phillips cited the document's condition, noting that it "wasn't dirty and filthy . . . [and] appeared to be placed there and turned over under some books." Phillips Dep. at 147:4–20. Phillips has not explained why she believes it was Hinckley who hid the document, but claims that Hinckley later used the document to train a female employee named Jessica. Phillips Dep. at 151:16–152:4. Hinckley maintained that, at the time of the incident, he was unaware that the document contained information related to the pager system. Hinckley Dep. at 36:5–17.

Later that month, Raytheon created a separate Integration and Test Group within the Systems Engineering Group. Campbell Decl. ¶ 14. Raytheon assigned Phillips to this new group and named Hinckley as its Supervisor. *Id.* ¶ 15. As a result of this reorganization, Hinckley became Phillips' direct supervisor. *Id.* ¶ 16.

Phillips also complains about a Christmas lunch in December 2007, when she joined five male Raytheon employees, including Hinckley. At the lunch, Hinckley told a story about his time in the Navy, and named the characters in the story after the individuals present at the lunch. The character to whom he assigned the name "Cynthia" had behaved in a "silly" or "dumb" way. Phillips Dep. at 152:10–154:12; Hinckley Dep. at 24:1–25:7.

In January 2008, Robinson sent an email to several Raytheon employees, including Phillips, requesting that they provide comments for him to include in an annual performance appraisal of Hinckley. Opp. Ex. 30 (ECF 47-30). Although Phillips indicated that she would provide her comments in the next two days, she never did so. *Id.*; *see also* Deposition of Peter Robinson ("Robinson Dep.") at 27:20–29:5.

In March 2008, as part of the company's annual performance evaluation process, Raytheon asked Phillips to submit a self-evaluation. Robinson Dep. at 35:15–36:7; Phillips Chart at 3. While drafting her self-evaluation, Phillips wrote two single-spaced pages about the "insults and abuse" she felt she had endured "at the hands of Bob Hinckley." Phillips Chart at 3; Phillips Aff. ¶ 7. On March 15, 2008, Phillips decided to report Hinckley's behavior to HR, and she made an appointment to meet with HR employee Ingrid Ross-Sinkler on March 21, 2008. Phillips Dep. at 155:18–159:2; Phillips Aff. ¶ 7. Prior to that appointment, on March 19, 2008, Phillips met with Robinson to discuss her interactions with Hinckley. Phillips Aff. ¶ 10. Robinson advised Phillips not to report the incidents to HR, instead assuring her that he would discuss the matter with Cottrell and then decide the appropriate course of action. Phillips Aff. ¶ 10; Robinson Dep. at 26:20–30:15. As a result, Phillips cancelled her March 21 meeting with Ross-Sinkler. Phillips Aff. ¶ 10.

When Robinson and Cottrell did not take any formal action by March 28, 2008, Phillips decided to meet with Ross-Sinkler. Phillips Dep. at 159:2–14; *see* Robinson Dep. at 30:16–31:10. At their meeting, Ross-Sinkler advised Phillips to write a detailed account of her interactions with Hinckley. Phillips Aff. ¶ 11. Later that day, Robinson informed Phillips that he was aware that she had met with Ross-Sinkler, and he urged Phillips to write about her interactions with Hinckley in a document separate from her self-evaluation. Phillips Aff. ¶ 12. Her self-evaluation, he explained, should describe her job performance and not her interpersonal conflicts. *Id*.; *see also* Robinson Dep. at 34:13–35:5. Three days later, Phillips submitted her self-evaluation to Robinson via email. *See* Opp. Ex. 34 (ECF 47-34). Despite Robinson's

requests, Phillips included a lengthy description of her interactions with Hinckley. Robinson Dep. 35:15–21, 38:22–39:6.

The next day, April 1, 2008, Leonelli, Cottrell, Robinson, and Hinckley met to discuss Phillips' concerns. Mallam served as the HR representative at the meeting. The attendees discussed Phillips' technical value to and personal interactions with the team. *See* Mot. Ex. 34 (ECF 44-36) at 1; Opp. Ex. 25 (ECF 47-25) at 1. Leonelli warned Hinckley that he "could be creating an abusive environment" and reminded the others of the company's sexual harassment policy.[7] *See* Mot. Ex. 34 (ECF 44-36) at 1–2; Opp. Ex. 25 (ECF 47-25) at 1–2.

The following day, April 2, 2008, Leonelli met with Phillips. HR's Ross-Sinkler and Mallam were also present. At the meeting, Phillips raised numerous concerns about Hinckley. In describing her interactions with Hinckley, Phillips noted that she "doesn't believe it is a racial issue, but more of a female issue" and that she believed Hinckley "has 'female abuse' issues." *See* Mot. Ex. 34 (ECF 44-36) at 2; Opp. Ex. 25 (ECF 47-25) at 2. Phillips claims that Leonelli instructed her not to "act like a victim." Phillips Aff. ¶ 14.

Leonelli, Hinckley, Mallam, and Phillips met again on April 3, 2008. Leonelli asked Phillips what course of action she wanted the company to take, and Phillips replied that she wanted Hinckley to undergo sensitivity training and to be formally censured. *See* Mot. Ex. 34 (ECF 44-36) at 3; Opp. Ex. 25 (ECF 47-25) at 3.

On April 7, 2008, Cottrell sent Hinckley a memorandum regarding workplace behavior, which Hinckley signed. *See* Mot. Ex. 35 (ECF 44-37) at 1. In the memorandum, Cottrell

---

[7] Raytheon has not produced a copy of its sexual harassment policy, but referred to it in an interoffice memorandum sent to Hinckley on April 7, 2008, discussed *infra*. *See* ECF 44-37 (quoting from "AST Policy POL-035-9").

advised Hinckley that "management has been informed of multiple instances of an employee under your supervision feeling personally and professionally insulted by your behavior toward her, as well as feeling threatened with retaliation." *Id*. He also admonished Hinckley for his "unacceptable behavior," and informed him that the company would "exhibit zero tolerance for further instances of behaviors discussed" in the previous week's meetings. *Id*. at 2. Moreover, Hinckley was told that his "behavior and actions must be fair and ethical, and above reproach," because "management will accept nothing less." *Id*. at 1. In addition, he was advised: "Continued complaints about your behavior and treatment of employees will result in more serious disciplinary action." *Id*. at 2.

In addition, the memorandum quoted portions of "AST Policy POL-035-91," which stated, in part: "'Applied Signal Technology is committed to fair and ethical behavior, and our corporate reputation for adhering to high standards is one of our most valuable assets.'" *Id*. at 1 (quoting Policy). Further, the Policy stated: "'Applied Signal Technology expects its employees to conduct business with the highest possible standards of *personal* and professional conduct. It is important to the Company that these standards are taken seriously by all employees. Accordingly, violations of these standards will *not be tolerated*.'" *Id.* (quoting Policy) (emphasis added by Raytheon). In addition, Hinckley was reminded that "all employees are required to read and signify their understanding of this policy on a yearly basis," and he was urged to review the policy. *Id.*

At some point that year, Raytheon conducted sensitivity training for its employees. Deposition of Joseph Leonelli ("Leonelli Dep.") at 23:18–24:10; Deposition of Ingrid Ross-Sinkler ("Ross-Sinkler Dep.") at 22:9–24, 24:25–25:4.

On April 24, 2008, Phillips met with Hinckley and Robinson for her annual review. Phillips alleges that Robinson referred to Phillips' job-related interactions as "unprofessional" and "hostile." Phillips Aff. ¶ 33. Phillips felt that Robinson intended "to provoke her into acting unprofessionally" because of her previous complaints about Hinckley. *Id.* At the end of the meeting, Robinson offered Phillips a 3% salary increase. Opp. Ex. 29 (ECF 44-17).

Phillips filed a complaint with HR about Robinson's comments at the meeting and suggested that her salary increase would have been greater had she not filed a complaint against Hinckley. Opp. Ex. 29 (ECF 47-29); Mot. Ex. 15 (ECF 44-17). She also complained that "a cost of living raise is currently running around 4.6%." However, Phillips has not provided any evidence relating to salary or cost-of-living increases awarded to other employees to show that she was treated less favorably than similarly situated employees.

At Phillips' request, she moved into a different office space in June 2008. *See* Robinson Dep. at 57:2–8; Mot. Ex. 37 (ECF 44-39) at 3. Phillips suggests that she did not request the relocation of her office. *See, e.g.*, Phillips Aff. ¶ 16 ("Hinckley moved me into a separate office . . . ."); Phillips Chart at 5 ("Joe Leonelli decided it was best that I move to another office."). However, Phillips' deposition testimony and April 2008 self-evaluation establish that she requested another office. *See* Phillips Dep. at 201:9 ("I asked to be separated from Bob."); *Id.* at 202:6–12; Phillips' April 2008 Employee Self-Appraisal, Ex. 37 to Memo (ECF 44-39) at 3 ("I would like to have a different office.").

Around the same time (June 2008), Hinckley advised Phillips that she need not attend the Configuration Control Board's weekly status meetings. Hinckley Dep. at 50:7–12. According to

- 9 -

Hinckley, he had initially asked both Phillips and her male co-worker, Jerome McDonald,[8] a software tester at Raytheon, to attend the meetings. *Id.* at 50:7–19; Deposition of Jerome McDonald ("McDonald Dep.") at 8:6–8. Once they "understood some of the process," however, it was no longer necessary for Phillips and McDonald to attend, which Hinckley explained. Hinckley Dep. at 50:7-19.

In June or July 2008, Raytheon again reorganized the Wireless Communications Systems Division,[9] this time renaming it the Intelligence and Electronics Warfare Division. Campbell Decl. ¶ 17. On July 28, 2008, Cottrell transferred Phillips from Hinckley's Integration and Test Group to the Systems Engineering Group, which was supervised by Eric Glover. Campbell Decl. ¶ 18; Opp. Ex. 26 (ECF 47-26); Phillips Dep. at 212:10–21.

Shortly after the change in supervisory authority, Hinckley completed an interim performance review of Phillips. Phillips Dep. at 214:11–22; *see* Interim Performance Review, Mot. Ex. 17 (ECF 44-19). In the review, Hinckley thanked Phillips for her efforts and noted his belief that he and Phillips "have made excellent strides in understanding each others [sic] working ethics" and that she had "helped [him] improve some of [his] organizational skills." *Id.* at 1. Hinckley also wrote that he "appreciate[d] [Phillips'] enormous improvement in our testing documentation." *Id.* In Section Three of the evaluation, titled "Comments," Hinckley included a list of character traits and professional skills "that make up an extraordinary leader," which he

---

[8] McDonald left Raytheon's employ in December 2008. McDonald Dep. at 8:20–22.

[9] Plaintiff claims that this reorganization took place "around June of 2008." *See* Phillips Aff. ¶ 15. Defendant argues that it took place in "late July 2008." *See* Campbell Decl. ¶ 17. The discrepancy is not material.

"wanted to share" with Phillips.  *Id.* at 2.  The list contained fifty-two bullet points, such as, *id.* at 2–3:

- Being approachable by anyone
- Treating everyone the same - no "smiling up and kicking down" behavior
- Treating the waitress and bellhop with dignity, as well as people of high status
- Being tenacious and not giving up because something is difficult
- Personally sponsor an initiative or action
- Developing the skills and talents of subordinates
- Teaching others in a helpful manner

According to Phillips, the list contained "false information" and was racially offensive.  Opp. at 10.  Specifically, Phillips claims that the evaluation was retaliatory and that the tenor of the evaluation suggests that Hinckley regarded her as an "uppity negro."  Phillips Aff. ¶ 18.

The next day, July 29, 2008, Phillips submitted a document to HR requesting a leave of absence for two surgical procedures, the first of which was to take place on August 22, 2008.  Phillips Dep. at 219:21–220:22.  Raytheon granted Phillips a leave of absence and on August 7, 2008, Phillips met with Ross-Sinkler to sign a Leave of Absence Agreement.  Mot. Ex. 18 (ECF 44-20).  The Agreement detailed Phillips' rights under the FMLA, including that "the maximum length of a FMLA Leave is 12 workweeks" and that "a physician's release to return to work is **<u>required</u>**." *Id.* (emphasis in original).  Phillips' leave of absence began on August 21, 2008.  Phillips Aff. ¶ 19.

### C.  Tahoe Project Cancellations

In August and September 2008, Raytheon's government client for the "Tahoe" project

terminated several of the nine platforms comprising the project.[10]  Campbell Dep. at 15:1–16:10;

Cottrell Dep. 50:21–51:11.  The parties dispute the impact of these cancellations on the projects

on which Phillips had been working.  Raytheon maintains that the cancellations affected both

Hinckley's Integration and Test Group and Glover's Systems Engineering Group.  According to

Raytheon, by January 2009 both groups had been reduced from six to three employees, and in

February 2009, the Integration and Test Group was disbanded entirely.  Campbell Decl. ¶ 22–24.

By the end of March, all of the individuals who had been performing software testing on Blue

Water and Emerald (other than Phillips) either found work on other Raytheon projects or left the

company voluntarily.  Campbell Decl. ¶ 25.

Phillips suggests that Raytheon has exaggerated the impact of the contract cancellations.

Specifically, Phillips notes that work on the Shasta project continued at least into late 2009.  *See,*

*e.g.*, McDonald Dep. at 28:12–37:18.  Additionally, Phillips has shown that Raytheon advertised

two available software testing positions in late January 2009.  *See* Deposition of Robert Adams,

Raytheon's Director of Mission Operations ("Adams Dep.") at 15:18–18:21.[11]

### D.  Phillips' Attempted Return to Raytheon

In early November 2008, Phillips emailed Glover and McDonald to inform them of her

intent to return to work on November 10, 2008.  Phillips Aff. ¶ 35.[12]  Phillips claims that she

then contacted Ross-Sinkler to request permission to return on November 17, 2008, due to "a

---

[10] The parties disagree as to the number of and identities of the platforms that were terminated, but plaintiff does not dispute that the government terminated contracts relating to a significant number of the platforms.

[11] Adams' responsibilities included "staff[ing] as many people as possible on contracts." Adams Dep. at 13:13–14.

[12] Phillips has not produced a copy of this email.

delay in the paperwork by [her] doctor." Phillips Aff. ¶ 35. According to Phillips, Ross-Sinkler advised that such an arrangement would be acceptable and did not notify Phillips that she might forfeit her FMLA protection by returning more than twelve weeks after her leave of absence began. Phillips Aff. ¶ 35. Raytheon disputes that any such conversation between Phillips and Ross-Sinkler took place, noting that Phillips' Amended Complaint, deposition testimony, and chart of events make no mention of any such conversation. *See* Reply at 21–22. In any event, Phillips was not medically cleared to return to work until November 24, 2008. *See* Mot. Ex. 20 (ECF 44-22).

On November 14, 2008, Cottrell contacted Phillips to inform her that because of the Tahoe contract cancellations, Raytheon had no work available for her. Phillips Dep. at 233:19–234:7. Cottrell advised Phillips not to return to work, but he also assured her that she had not been fired. *Id.*; Phillips Chart at 6. One week later, on November 21, 2008, Ross-Sinkler contacted Phillips with essentially the same information; namely, that she had not been fired but should not return to work. Phillips Dep. at 234:17–22; Phillips Chart at 6.

Raytheon sent a letter to Phillips on December 19, 2008, advising that the company "no longer [had her] current position available for [her]," informing Phillips that Raytheon would pay her in full for the period between her medical clearance on November 24, 2008 and December 26, 2008, and requesting that she report to work on December 29, 2008, "to discuss other opportunities that may be available" within the company. Mot. Ex. 23 (ECF 44-25). Phillips returned to work on December 29, 2008. Phillips Dep. at 248:8–249:1. Upon her return, Phillips met with Leonelli and Ross-Sinkler, who informed her that she would have up to two weeks to find a new position within the company. Leonelli Decl. ¶ 12. The parties dispute the extent to

- 13 -

which Leonelli, Cottrell, and Glover assisted Phillips in her job search.  *Compare* Phillips Aff. ¶ 25–29 *with* Cottrell Decl. ¶ 19–21.

Phillips did not secure a new position within Raytheon.  On January 9, 2009, Raytheon terminated Phillips' employment.  *See* Opp. Ex. 15 (ECF 47-15).  Raytheon sent Phillips a Termination Letter advising that, "due to the fact that, we have lost funding for the programs you specifically worked on; we currently do not have any position available that fits your skill set. As a result, your position as a test engineer is being eliminated."  *Id.*

Phillips filed a charge of discrimination with the Maryland Commission on Civil Rights (formerly known as the Maryland Commission on Human Relations) on March 23, 2009.  *See* Mot. Ex. 33 (ECF 44-35).  On June 30, 2011, the Equal Employment Opportunity Commission ("EEOC") dismissed Phillips' charge and notified her of her right to sue.  *See* Mot. Ex. 36 (ECF 44-38).

Additional facts will be included in the discussion.

## Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  It provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In response to a motion for summary judgment, the non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a

matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U. S. at 247-48 (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

**Discussion**

A. Title VII Claims (Counts I–V)

Plaintiff brings three types of claims under Title VII: substantive employment discrimination based on race and gender (Counts I and II), hostile work environment based on race and gender (Counts III and IV), and retaliation (Count V). In her Opposition, plaintiff states: "Candidly, there is scant evidence of race discrimination." Opp. at 27. Nevertheless, because plaintiff did not formally abandon her claim of race discrimination, I will include it in my discussion of the issues.

*1. Substantive Employment Discrimination (Counts I and II)*

Plaintiff claims that Raytheon discriminated against her on the basis of race and sex, in violation of Title VII of the Civil Rights Act of 1964. Raytheon contends, *inter alia*, that most of plaintiff's underlying contentions are untimely because they occurred more than 300 days prior to the administrative charge she filed with the EEOC. Memo at 18. In her Opposition, Phillips includes a section titled "Plaintiff's Discrimination Claims Are Not Time Barred Because the Retaliatory Conduct Continued the Discrimination Toward the Plaintiff." Opp. at 26. However, the text under that heading does not appear to present any argument on the point; rather, it discusses the substantive standard for a hostile work environment claim. *See id.* ¶¶ 27–29.

Before filing a claim under Title VII, a "person aggrieved" by an alleged unlawful discriminatory employment practice must timely exhaust her administrative remedies. *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 406 (4th Cir. 2013). In particular, a plaintiff

must file a "charge" of discrimination with the EEOC or, in a "deferral" jurisdiction,[13] with an appropriate state or local agency, within a specified time "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). *See, e.g., Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 and n.3 (4th Cir. 2002). Suit cannot be brought until the administrative process is exhausted. *Chacko v. Patuxent Inst.,* 429 F.3d 505, 509 (4th Cir. 2005). Maryland is a deferral state under Title VII; the Maryland Commission on Human Relations ("MCHR") is the applicable state enforcement agency. *Prelich*, 813 F. Supp. 2d at 661; *see* 29 C.F.R. § 1601.74 (listing qualifying state enforcement agencies); *see also EEOG v. R & R Ventures*, 244 F.3d 334, 338 n.* (4th Cir. 2001).

Title VII prescribes the time by which a claim must be filed. In a deferral jurisdiction, the limitations period is 300 days after the occurrence of the alleged unlawful employment practice; otherwise, the period is 180 days. *See* 42 U.S.C. § 2000e–5(e)(1); *see also Chacko,* 429 F.3d at 508; *Prelich,* 813 F.Supp.2d at 661–62.

In *Balas*, 711 F.3d at 406–07, the Fourth Circuit summarized the two principal purposes of Title VII's exhaustion requirement.

> "'First, it notifies the charged party of the asserted violation. Secondly, it brings the charged party before the EEOC and permits effectuation of the [Civil Rights] Act's primary goal, the securing of voluntary compliance with the law.'" *Dickey v. Greene,* 710 F.2d 1003, 1005 (4th Cir. 1983), *rev'd on other grounds,* 729 F.2d 957 (4th Cir. 1984) (quoting *Bowe v. Colgate–Palmolive Co.*, 416 F.2d 711, 719 (7th Cir. 1969)). The filing of an administrative charge, therefore, "is not simply a formality to be rushed through so that an individual can quickly file his

---

[13] A deferral jurisdiction is a state that has a law prohibiting employment discrimination on the same bases covered by the federal statutes, and authorizing a state or local agency to grant or seek relief from such discrimination. *See* 42 U.S.C. § 2000e–5(c), (d); *see, e.g., Edelman v. Lynchburg Coll.,* 300 F.3d 400, 404 & n.3 (4th Cir. 2002); *Prelich v. Med. Resources, Inc.,* 813 F. Supp. 2d 654, 661–62 (D. Md. 2011).

subsequent lawsuit." *Chacko v. Patuxent Inst.,* 429 F.3d 505, 510 (4th Cir. 2005). Rather, the charge itself serves a vital function in the process of remedying an unlawful employment practice.

*See also Sydnor v. Fairfax County*, 681 F.3d 591, 593 (4th Cir. 2012).

Plaintiff filed her complaint with the MCHR on or about March 25, 2009. Mot. Ex. 33 (ECF 44-35).[14] Raytheon concedes that the 300-day limitations period, rather than the 180-day limitations period, applies in this case. Raytheon Memo at 18. In view of the 300-day limitation period, plaintiff may complain only of substantive discriminatory acts that occurred on or after May 29, 2008. Conduct by defendant prior to that date is not actionable.[15]

I turn to the merits of plaintiff's discrimination claims under Title VII.

Title VII prohibits an employer from, *inter alia*, discharging or discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Moreover, as amended by the Civil Rights Act of 1991, Title VII expressly provides for "mixed-motive" liability, stating: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color,

---

[14] The Charge was signed and notarized on March 23, 2009, but was not stamped as received by the EEOC office until March 25, 2009. ECF 44-35 at 1–2.

[15] Although conduct occurring prior to May 29, 2008, is not actionable as part of a substantive discrimination claim, those acts may still form the basis of plaintiff's hostile work environment claim. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) ("We conclude that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period—180 or 300 days—set forth in 42 U.S.C. § 2000e–5(e)(1). A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.").

religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m).

In general, there are "two avenues" at trial by which a plaintiff may prove that an adverse employment action amounts to intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted). "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original).

The second avenue available to the plaintiff is to follow the burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n. 2 (4th Cir. 1989) (citation omitted).

Absent direct evidence of discrimination, the plaintiff at trial must first establish, by a preponderance of the evidence, a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411

U.S. at 802 n. 13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination," *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  For example, the Fourth Circuit has framed the prima facie case as: "1) membership in a protected class; 2) satisfactory job performance; 3) adverse employment action . . . ; and 4) that similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC,* 375 F.3d 288, 295 (4th Cir. 2004); *see also Gerner v. County of Chesterfield, Va.*, 674 F.3d 264, 266 (4th Cir. 2012).  In a disparate treatment case, the plaintiff must prove that the defendant had a discriminatory motive or intent. *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986 (1988).

If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).[16]  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply

_____

[16] In cases where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment, it is a common practice to assume, without deciding, that the plaintiff has established a prima facie case.  *See, e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319–20 (4th Cir. 2005); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp.2d 729, 736–37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510–11. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983).

When the defendant meets his or its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

The relevance of the *McDonnell Douglas* scheme outside of the trial context is limited, however. The Fourth Circuit has admonished district courts at the summary judgment stage to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). Further, the Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof

schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*.'" *Id*. at 294–95 (citation omitted).

Under either of the two frameworks of proof applicable at trial, the plaintiff must show that the employer took an "adverse employment action." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999); *see also James*, 368 F.3d at 376. But, "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 329 (D. Md. 2003).

Plaintiff identified numerous allegedly discriminatory acts committed by Hinckley, and she alleges that Raytheon violated Title VII by failing to "timely and effectively address" these acts. Am. Compl. ¶¶ 33, 36. Additionally, plaintiff claims that her termination constituted a discrete act of discrimination on the basis of sex. *See* Opp. at 30. Raytheon responds by asserting that many of plaintiff's claims are "too trivial and remote in time" to support a finding of liability; it had a legitimate, nondiscriminatory reason for terminating plaintiff, *viz.*, a reduction of funding and loss of work in regard to the Tahoe Project; and no evidence exists that plaintiff's sex or race played any role in her termination. Memo at 14–18.

Several of plaintiff's claims are time-barred. Moreover, plaintiff has essentially conceded that the alleged discrimination was not based on race. *See* Opp. at 27. And, in my view, she has not adduced sufficient evidence for a reasonable jury to conclude that her timely claims constituted discrimination based on sex under Title VII. Accordingly, as explicated below, I will grant summary judgment to defendant with respect to Counts I and II.

Plaintiff alleges that Hinckley referred to her in a derogatory manner and insulted her on several occasions between April and June 2007, in October 2007, and in December 2007. *See* Factual Summary at 3–5, Am. Compl. ¶¶ 3–5; Phillips Chart at 3; Phillips Dep. at 152:10–154:12. Each alleged comment was made more than 300 days prior to the filing by plaintiff of her EEOC complaint on March 25, 2009. Accordingly, plaintiff is time-barred from premising her employment discrimination claim on these comments. *See White*, *supra*, 375 F.3d at 292.

Alternatively, these allegations would not permit a reasonable jury to find employment discrimination based on sex or race. To be sure, disparaging remarks by a supervisor might support a claim of a hostile work environment, as discussed *infra*. But, they do not constitute an "adverse employment action" for the purpose of a Title VII discrimination claim, because they generally have no "tangible effect on the terms or conditions of employment." *James*, 368 F.3d at 377; *see also Clarke v. DynCorp Int'l LLC*, __ F.Supp.2d __, 2013 WL 4495817 at *7 (D. Md. Aug. 20, 2013) (Unwelcome and offensive comments "do not represent an adverse employment action."); *Smith v. Vilsack*, 832 F. Supp. 2d 573, 586 n.9 (D. Md. 2011) ("The alleged comments might have been frank or even harsh, but there is no argument that the comments generated any of the typical forms of adverse action . . . ."); *Blount v. Dep't of Health & Human Servs.*, 400 F. Supp. 2d 838, 842 (D. Md. 2004) ("[D]isparaging remarks made by a supervisor do not state an

adverse employment action."). Accordingly, Hinckley's comments, even if motivated by gender or racial animus, do not amount to employment discrimination for purposes of Title VII.

Plaintiff also complains that Hinckley concealed a "key document" in the bottom of a drawer on or before October 2, 2007. Am. Compl. ¶ 8; Phillips Chart at 3. This document, according to Phillips, was a heavily used, process-oriented document that would have helped her complete one of her projects more efficiently. *See* Phillips Dep. at 147:4–150:9; Phillips Chart at 3. As with Hinckley's allegedly improper comments, this event took place more than 300 days before plaintiff filed her EEOC complaint. Accordingly, plaintiff is time-barred from pursuing her claim that this conduct violated Title VII. *See White*, 375 F.3d at 292.

Even if this contention were not time-barred, plaintiff's claim that Hinckley concealed a document from her would not support liability for sex or race discrimination under Title VII, because plaintiff does not contend that the concealment had any tangible effect on her employment. Although plaintiff claims that the concealed document was "a very key process oriented piece of information that would help us with our job," and that she needed it to perform her work properly, Phillips Dep. at 147:4–150:9, plaintiff does not allege (or provide any evidence) that there were any consequences due to her inability to access the document. For example, Phillips does not claim that the conduct impeded her promotion, or that she was denied a bonus or suffered any employment consequences. *See James*, 368 F.3d at 376; *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998); *see also Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 650 (4th Cir. 2002). Accordingly, no reasonable jury could find that the alleged concealment of the document constituted an adverse employment action.

Further, plaintiff alleges that Hinckley prepared a racially offensive performance review on July 30, 2008. Specifically, plaintiff points to the fifty-two item list of character traits and skills that Hinckley appended to an Interim Performance Review, asserting that it gave her the impression that Hinckley thought she was an "uppity negro." Am. Compl. ¶ 17. Even if, as plaintiff claims, the performance review was offensive—and even if, straining credulity, the performance review was racially tinged—performance evaluations ordinarily do not to rise to the level of an "adverse employment action." *See Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 423 (D. Md. 2006) (indicating that letter of reprimand is not an adverse employment action); *Jeffers*, 264 F. Supp. 2d at 330 ("Like a reprimand, a poor performance rating does not in itself constitute an adverse employment action. 'Rather, it is a mediate step, which, if relied upon for a true adverse employment action (e.g., discharge, demotion, etc.) becomes relevant evidence.'" (citations omitted)).

As discussed, the salient question in evaluating an employment discrimination claim "is whether there was a change in the terms or conditions of [the plaintiff's] employment which had a 'significant detrimental effect' on [her] opportunities for promotion or professional development." *James*, *supra*, 368 F.3d at 376 (quoting *Boone*, 178 F.3d at 256). In this case, there is no evidence that Hinckley's performance evaluation caused any detrimental effect on her employment, nor does plaintiff allege that the review played any role in her subsequent termination. Indeed, plaintiff concedes that Hinckley never even submitted the evaluation to the company's HR department. Am. Compl. ¶ 17 ("Bob Hinckley did not file the evaluation with HR . . . ."). Because plaintiff fails to identify any tangible detrimental effect resulting from

Hinckley's evaluation, no reasonable jury could find that the performance review constituted an adverse employment action.

In addition, plaintiff claims that she was improperly terminated because of her gender. Opp. at 30. Before addressing this claim, I must first consider Raytheon's argument that plaintiff forfeited the claim by failing to plead it in her Amended Complaint.

Raytheon argues in its Reply that plaintiff did not allege in her Complaint that her termination was a discrete act of gender discrimination, and thus she may not raise the argument at the summary judgment stage. *See* Reply at 5. In my view, plaintiff's Complaint, liberally construed, adequately put Raytheon on notice of plaintiff's allegation that her termination was the product of sex discrimination.[17]

Notice pleading rests on the principle that the a complaint should "give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in *Twombly*). Fed. R. Civ. P. 8 provides that "[p]leadings must be construed so as to do justice," but pleadings should not be read so liberally so as to deprive a defendant of notice. *See Twombly*, 550 U.S. at 555. In any event, the liberal pleading standards mandated by the Federal Rules of Civil Procedure do "not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004). Rather, at the summary judgment stage, "the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P.

---

[17] Plaintiff has not alleged that her termination was an act of race-based discrimination.

15(a).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Id.* at 1315.

In Counts I and II, plaintiff alleges that "Bob Hinckleys' [sic] conduct toward the plaintiff was based upon his animosity toward plaintiff's [female sex and] African American race," and that Raytheon's "failure to timely and effectively address the discriminatory acts of Bob Hinckley constitutes a violation of Title VII."  Am. Compl. ¶¶ 32–33, 35–36.  Plaintiff does not clearly allege in her Complaint that her termination violated Title VII until Count V, in which she alleges only that it constituted improper retaliation.  *Id.* at ¶ 42.  Nonetheless, Raytheon's Motion for Summary Judgment directly addresses the allegation that Phillips' termination was itself discriminatory.  *See* Memo at 16–18 ("The sole adverse action Phillips experienced that she claims was related to discriminatory animus was her January 9, 2009 termination.").  This makes clear that plaintiff's Complaint adequately placed Raytheon on notice that plaintiff believed her termination was a discrete act of substantive sex discrimination.

Raytheon's citations to unpublished Fourth Circuit opinions do not dictate a contrary result.  In *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 560 (4th Cir. 2008), the Fourth Circuit refused to consider on summary judgment the plaintiff's claims regarding eleven disputed change orders on a construction contract.  *Id.* at 563–566.  The plaintiff's complaint, according to the court, made no mention of these eleven disputed change orders, instead only alleging that the plaintiff was due payment on three other, undisputed change orders.  *Id.* at 564.  Accordingly, the defendant lacked notice that the eleven change orders were disputed, and thus was deprived of an opportunity to conduct discovery on them.  *Id.*  In contrast, plaintiff's Complaint clearly alleges that her termination violated both Title VII and the FMLA,

*see* Am. Compl. ¶¶ 19–29, 33c, 36c, 42, 48–51, and Raytheon conducted extensive discovery on the matter. *See, e.g.*, Leonelli Dep. 35:12–18; Campbell Dep. at 15:1–16:10; Cottrell Dep. 22:4–6, 50:21–52:8. Raytheon fares no better with *In re Peanut Crop Ins. Litig.*, 429 Fed. App'x 246 (4th Cir. 2011). In that case, the Fourth Circuit refused to consider a Fifth Amendment Takings claim that plaintiffs raised for the first time in response to the defendant's summary judgment motion, seven years after the complaint was filed. *In re Peanut Crop Ins. Litig.*, 429 Fed. App'x at 248 n.1. Plaintiff has not added a new claim; she asserts that her termination supports her claim of discrimination under Title VII.

Accordingly, I find that plaintiff's claim that her termination was an act of sex discrimination is properly before the Court. Therefore, I proceed to consider whether the claim survives Raytheon's motion for summary judgment.

Plaintiff's termination from Raytheon's employ was clearly an adverse employment action. *See, e.g.*, *Balas*, *supra*, 711 F.3d at 410. Raytheon has produced ample evidence that plaintiff was not terminated because of her sex. As noted, to avoid summary judgment, there must be direct evidence of discrimination or indirect evidence "of sufficient probative force to reflect a genuine issue of material fact." *Rhoads*, 257 F.3d at 391. Plaintiff has not adduced evidence sufficient to permit a reasonable jury to find that her sex was a motivating factor in Raytheon's decision to terminate her employment. Put another way, plaintiff has not created a material dispute of fact controverting defendant's contention.

In *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510 (4th Cir. 2006), an age discrimination case, the Fourth Circuit reviewed a grant of summary judgment in favor of the employer, and addressed both direct evidence and the *McDonnell Douglas* proof scheme in that

context. The Court considered whether the employee "produced sufficient evidence from which a jury could conclude that he met [the employer's] legitimate job expectations. *Id*. at 517. It noted, *inter alia*, that the employee "presented no evidence," direct or circumstantial, as to the claim of termination based on a pretextual need for a reduction in force. *Id*. at 519-21. In addressing direct evidence, the Court said, *id*. at 520:

> Direct evidence must be "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir.1999) (en banc) (citation and internal quotation marks omitted). Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action. *See Brinkley,* 180 F.3d at 608 ("To survive summary judgment on the basis of direct and indirect evidence, Brinkley must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action.").

Although Phillips has produced evidence from which a jury could find that Hinckley made discriminatory statements, she has failed to produce any evidence, direct or circumstantial, from which a reasonable jury could find a "nexus" between Hinckley's statements and plaintiff's termination. Where, as here, a plaintiff seeks to establish a nexus by alleging that a supervisor's discriminatory animus infected a termination decision,[18] the plaintiff must show that the

_____

[18] After the briefing of the Motion, the Supreme Court decided *Vance v. Ball State Univ.*, ____ U.S. ____, 133 S. Ct. 2434 (2013), holding that, in a hostile work environment claim, "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim," *i.e.*, "to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 2439, 2443 (quoting *Ellerth*, 524 U.S. at 761).

Phillips refers to Hinckley as her supervisor throughout her Opposition. *See, e.g.*, Opp. at 5. But, the parties have not had the opportunity to address, post *Vance*, whether Hinckley was plaintiff's "supervisor" under the definition in *Vance*. Nevertheless, I shall assume, for purposes of this Motion, that Hinckley qualified as plaintiff's "supervisor" under Title VII.

supervisor both "*intended . . . to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action.*" *Staub v. Proctor Hosp.*, ____ U.S. ____, 131 S. Ct. 1186, 1194 (2011) (emphasis in original).[19]

The only evidence that might suggest Hinckley played *any* role in the decision to terminate plaintiff derives from an email from Cottrell to Leonelli on December 9, 2008. *See* Opp. Ex. 38 (ECF 47-38). In the email, Cottrell noted that several Raytheon employees, including Cottrell, Glover, Hinckley, and Ross-Sinkler, met "to discuss how to proceed with Cynthia Phillips." *Id.* This email, however, was sent a full month prior to plaintiff's termination and, although plaintiff deposed several of the meeting's attendees, there is no evidence that Phillips' termination was discussed at the meeting. Moreover, Raytheon has produced evidence suggesting that the meeting's attendees discussed how to find Phillips a new position within the company, not how to terminate her employment. For example, Cottrell's memorandum to Leonelli on January 29, 2009 recounts that the attendees had discussed "the stop-work condition, and the prospects for continued work for Mrs. Phillips." Ex. E to Cottrell Decl. In addition, Raytheon produced several emails sent after the meeting in which members of management

---

[19] The *Staub* Court "expressed no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision." *Staub*, ____ U.S. ____, 131 S. Ct. at 1194 n.4. Presumably, liability would be less likely to attach to the employer if the harasser was only a co-worker. *Cf. Vance*, ____ U.S. ____, 133 S. Ct. at 2439 (noting that in a hostile environment claim, an employer is liable in negligence for harassment by a co-worker, but is strictly liable for harassment by a supervisor).

Although the claim in *Staub* arose under the Uniformed Services Employment and Reemployment Rights Act rather than Title VII, the Fourth Circuit has endorsed this so-called "cat's paw" theory of liability in the Title VII and ADEA context, so long as the individual harboring unlawful motives is, in effect if not in name, "the one principally responsible for the decision or the actual decisionmaker for the employer." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004).

made efforts to place Phillips in a new position within the company. *See, e.g.*, ECF 44-26; ECF 44-28; Ex. C to Leonelli Decl.; Exs. B–D to Cottrell Decl.

In addition, Raytheon has produced evidence that Hinckley was not involved in the decision to terminate Phillips. Raytheon introduced several emails in the days leading up to plaintiff's termination, none of which were sent to or from Hinckley. *See* Mot. Exs. 27–30 (ECF 44-29–32). And, it is undisputed that, at the time of Phillips' termination, Hinckley was no longer Phillips' supervisor. *See* Campbell Decl. ¶ 18; Opp. Ex. 26 (ECF 47-26); Phillips Dep. at 212:10–21. Moreover, at his deposition, Hinckley denied that he had any involvement in Phillips' termination or that anyone solicited his input on whether she should be discharged. Hinckley Dep. at 85:17–86:9. In light of the evidence presented with regard to the Motion, I am satisfied that no reasonable jury could conclude that Hinckley was the proximate cause of the decision to terminate Phillips' employment.

Plaintiff fares no better in connection with the *McDonnell Douglas* framework. To establish a prima facie case in a claim for discriminatory termination, a plaintiff must offer evidence "(1) that he is a member of a protected class; (2) that he suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). Plaintiff's own allegations reveal that she cannot satisfy the fourth element of the prima facie case. Phillips alleges that Raytheon did not eliminate her position due to contract cancellations. Rather, she claims that Raytheon's reason was pretextual,

as evidenced by the fact that Raytheon gave her position to two other Raytheon employees, Theresa Green and Jay Moses. Phillips Aff. ¶ 24.

Even assuming that plaintiff established a prima facie case, Raytheon has offered ample evidence of a non-discriminatory reason for its termination of plaintiff. In particular, Raytheon submitted deposition testimony, declarations, and internal documents explaining that it terminated plaintiff because it was forced to eliminate her position after its government client cancelled several contracts. *See, e.g.*, Campbell Dep. at 15:1–16:10; Cottrell Dep. 50:21–52:1; Leonelli Decl. ¶¶ 8–10; Ex. C to Cottrell Decl.; Mot. Ex. 38 (ECF 44-40). As to plaintiff's allegation that "Theresa Green and Jay Moses were doing my job," Glover explained at his deposition that, after Phillips took FMLA leave, Green and Moses—who were already Raytheon employees—stepped in to take over some of the work that Phillips had been performing. Glover Dep. at 33:7–36:3. And, by the time Phillips was medically cleared to return to the office, "the work had been scaled back . . . So there was no requirement for full-time testing, which is what [plaintiff] was hired for. . . . There was not full-time work available." Leonelli Dep. at 31:7–34:5; *see id.* at 30:11–36:18.

Raytheon's contention of a non-discrimnatory reason for plaintiff's termination is buttressed by an email of January 5, 2009, from Cottrell to two of Raytheon's "work partners," in which Cottrell informed them, with regard to Phillips: "Due to changing requirements with one of our mutual customers, AST has available a senior Software Test Engineer for whom we are seeking potential subcontract work." *See* Cottrell Decl. ¶ 21; Ex. C to Cottrell Decl. Raytheon also submitted a letter of February 13, 2009, addressed to Earl Thompson, stating: "[D]ue to the fact that, we have lost funding from the programs you specifically worked on; we

currently do not have any positions available that fit your skill set.  As a result, your position as a

Staff Engineer is being eliminated."  Memo Ex. 38, ECF 44-40.  Additionally, Campbell stated

in his Declaration that, "[b]y the end of March 2009, all of the individuals who had been

performing software testing on the terminated Blue Water and Emerald platforms had voluntarily

left the Company or found new positions on other projects."  Campbell Decl. ¶ 25.

Raytheon's evidence plainly satisfied its burden to "'articulate a legitimate

nondiscriminatory reason for the adverse employment action.'"  *Adams*, supra, 640 F.3d at 559

(citation omitted).  Accordingly, to prevail on her claim, plaintiff is required to adduce evidence

that could convince a reasonable jury both that Raytheon's explanation is false and that the

explanation was a pretext for gender discrimination.  *See Brady*, *supra*, 520 F.3d at 493–94;

*Adams*, 640 F.3d at 560.  Plaintiff has failed to do so.

Plaintiff showed that the Shasta Project, on which she had spent 22% of her time, was

still active at the time of her termination.  *See* Opp. at 12–14.  Moreover, plaintiff submitted an

email of January 20, 2013, from Adams to Irene Chen, suggesting that Raytheon, just weeks

after terminating plaintiff's employment, was seeking to hire two new software testers for a

project called Ocean Surf.  Opp. Ex. 23 (ECF 47-23); Adams Dep. 15:18–18:21.  With respect to

the Shasta Project, Raytheon provided evidence that the project, although not entirely eliminated,

was still affected by the contract cancellations and thus could not support a full-time testing

position.  *See, e.g.*, Leonelli Dep. at 32:14–33:17; Glover Dep. at 35:12–36:3.  As to the open

positions on Ocean Surf, Adams explained that he was simply inquiring about software testers'

salaries to help him put together a proposal for the Ocean Surf contract.  Adams Dep. at 15:22–

18:13.  Moreover, in the email, Adams—apparently unaware that Phillips had been discharged—

requested information about Phillips' salary, suggesting that he was considering her for the open positions. Opp. Ex. 23 (ECF 47-23). Based on the foregoing, plaintiff has shown at least some dispute of fact as to whether her position was actually eliminated when part of the Tahoe Project was terminated.

However, a dispute about the veracity of the employer's proffered explanation does not automatically allow the plaintiff to proceed to trial. Rather, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148. Judgment as a matter of law remains appropriate if, for example, the plaintiff presents only a weak prima facie case, creates only a weak issue of fact as to whether the employer's explanation is untrue, and/or there is abundant evidence that no discrimination occurred. *See id.* at 148–49; *Holland*, *supra*, 487 F.3d at 215 ("Thus, a key factor for courts to consider is 'the probative value of the proof that the employer's explanation is false.'" (citation omitted)); *Price v. Thompson*, 380 F.3d 209, 217 (4th Cir. 2004) ("[A]lthough *Reeves* will allow a plaintiff to survive summary judgment without presenting independent evidence of discrimination (or retaliation), it will permit this only where the other evidence of discrimination is sufficiently strong to ensure that the employer is held liable for unlawful discrimination and not merely for inconsistent statements that arise from reading applications hastily or from being nervous during depositions.").

In my view, plaintiff has "created only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148. For example, plaintiff has not alleged or

proffered evidence of any gender animus on the part of Cottrell, Leonelli, Glover, or Ross-Sinkler, the four Raytheon employees directly involved in the decision to terminate plaintiff. *See* Mot. Ex. 30 (ECF 44-32); *see also Hill*, 354 F.3d at 298 (noting, in a summary judgment case, that "Hill has come forward with no evidence to demonstrate that the reason proffered by Lockheed was a pretext for discrimination on the part of its relevant decisionmakers."). To the contrary, the evidence reveals that those employees did not tolerate workplace harassment. After Phillips filed her HR complaint, Cottrell, Leonelli, and Ross-Sinkler held several meetings to discuss the allegations and ultimately provided plaintiff the precise relief she had requested. *See* Mot. Ex. 35 (ECF 44-37) at 1; Leonelli Dep. at 23:18–24:10; Ross-Sinkler Dep. at 22:9–24, 24:25–25:4. And, Cottrell's memorandum castigated Hinckley and expressed in no uncertain terms that the company would "exhibit zero tolerance" for further misconduct. *See* Mot. Ex. 35.

Additionally, although Phillips pointed to alleged misconduct by Hinckley, there is no evidence that Hinckley's alleged discriminatory actions or attitudes played any role in the decision to terminate plaintiff. As discussed above, plaintiff failed to adduce any evidence from which a factfinder could find a nexus between Hinckley's alleged bias and Phillips' termination. Although Phillips might be able to convince a jury that her termination "makes no business sense," Opp. at 19, she did not provide any evidence from which a reasonable jury could conclude that it was motivated by gender animus. *See Balazs v. Liebenthal*, 32 F.3d 151, 159 (4th Cir. 1994) ("'[Title VII does not] declare unlawful every arbitrary and unfair employment decision.'") (citation omitted).

Even if the loss of business did not compel Raytheon to terminate Phillips, plaintiff's reliance on Raytheon's decision to substitute Green for plaintiff does not advance plaintiff's

claim of gender discrimination. This is because Green, like Phillips, is female. Accordingly, even under plaintiff's theory, her position was not filled by an applicant "outside the protected class." *See Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998).

In my view, this is precisely the sort of the case the Supreme Court had in mind when it stated in *Reeves* that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." 530 U.S. at 148. Plaintiff has not presented sufficient evidence from which a factfinder could reasonably conclude that her termination was the result of sex discrimination, in violation of Title VII. Accordingly, summary judgment will be granted to Raytheon with respect to Counts I and II.

### 2. Hostile Work Environment (Counts III and IV)

Plaintiff claims that she was subjected to a racially and sexually hostile work environment. Am. Compl. ¶¶ 38, 40. Raytheon argues that plaintiff's allegations are insufficient to support a finding of a hostile work environment, and that there is no basis for imputing liability to Raytheon in any event, "because once the Company became aware of the harassment, it took reasonable steps to correct the conduct." Memo at 20.

Title VII creates a cause of action for a hostile working environment. *EEOC v. Xerxes Corp.*, 639 F.3d. 658, 668 (4th Cir. 2011); *Okoli v. City of Baltimore,* 648 F.3d 216, 220 (4th Cir. 2011); *Hoyle*, 650 F.3d at 331. A hostile work environment claim is premised on the notion that "an employee's work environment is a term or condition of employment." *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009) (internal citations and quotation marks omitted). In *Vance*, ____ U.S. ____, 133 S. Ct. at 2443, decided after this Motion was briefed,

the Supreme Court said: "We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status' . . . ." (quoting *Ellerth*, 524 U.S. at 761).

To survive summary judgment on a claim for a sexually or racially hostile work environment, a plaintiff must demonstrate that a reasonable jury could find that the offending conduct was "(1) unwelcome, (2) based on [plaintiff's] gender or race, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and (4) imputable to [defendant]." *Cent. Wholesalers*, 573 F.3d at 175; *see Xerxes Corp.*, 639 F.3d at 668–69.

With regard to the second element, an employee is harassed "because of" her race/gender if, but for her race/gender, she would not have been the victim of the discrimination. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000); *see Hoyle*, 650 F.3d at 331   But, "harassment due to personality conflicts will not suffice.  Some persons, for reasons wholly unrelated to race or gender, manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).  Therefore, in order to survive summary judgment, there must be sufficient evidence for a reasonable jury to conclude that the alleged harassment stemmed not from personal animosity, workplace competition, or general boorishness, but rather from race or gender-based animus.  "[A] trier of fact may reasonably find discrimination when 'a female victim is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.'" *Hoyle*, 650 F.3d at 331 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

As to the third element, in assessing whether conduct was sufficiently severe and pervasive so as to trigger liability, the court must "look to the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Okoli,* 648 F.3d at 220 (citations and internal quotation marks omitted). Notably, "[t]his element of a hostile work environment claim has both subjective and objective components." *Cent. Wholesalers*, 573 F.3d at 175 (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–23 (1993)). A plaintiff must show that she "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Cent. Wholesalers*, 573 F.3d at 175. Put another way, a jury must be able to find that a *reasonable person* would have found the harassment so severe and pervasive as to alter the terms and conditions of employment. "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted).

The fourth element—whether the offending conduct is imputable to the defendant employer—depends on the status of the harasser. "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a 'supervisor,' however, different rules apply." *Vance*, *supra*, ___ U.S. ___, 133 S. Ct. at 2439. The *Vance* Court continued, *id.*: "If the supervisor's harassment culminates in a tangible employment action [against the harassed employee], the employer is

strictly liable." *See also Ellerth*, 524 U.S. at 762. But, this vicarious liability standard applies only if there is "some nexus between the harassment and the tangible employment action." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 332 (4th Cir. 2012). In other words, if the harassing supervisor played no role in any subsequent tangible employment action, the strict liability standard does not apply. *See Ellerth*, 524 U.S. at 766 (Plaintiff did not allege that "she suffered a tangible employment action at the hands of [her harassing supervisor], which would deprive Burlington of the availability of the affirmative defense . . . ."); *Brown v. Perry*, 184 F.3d 388, 395 (4th Cir. 1999) (Plaintiff "suffered no tangible employment action at [her harasser's] hands . . . [thus,] imputation of liability to her employer is not automatic.").

"When a supervisor's harassment does not involve a tangible employment action," the employer may escape liability by establishing, as an affirmative defense, that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Brown*, 184 F.3d at 395 (citations and quotation marks omitted); *see Vance*, 133 S.Ct. at 2439; *Ellerth*, 524 U.S. 742 at 765–66.[20]

Plaintiff does not make entirely clear in her filings the particular allegations that comprise her claim of hostile work environment. But, in the light most favorable to plaintiff, I have identified six allegations that seem to constitute her claim: (1) multiple insults from Hinckley,

---

[20] As discussed, the parties have not briefed whether Hinckley was plaintiff's co-worker or supervisor as those terms are defined under Title VII. I need not resolve the question, however, because I conclude that Raytheon would not be liable even if Hinckley were a supervisor.

including his referring to plaintiff as "bitch," "dumb," "stupid," "ignorant," or "overpaid," Phillips Aff. ¶¶ 4–5; (2) Hinckley's alleged racially offensive performance review, *id.* at ¶ 18; (3) Raytheon's failure to remove Hinckley as plaintiff's supervisor, *id.* at ¶ 15; (4) Raytheon's decision to move plaintiff to a new office, *id.* at 16; (5) Robinson's suggestion that plaintiff reduce her workweek to 32 hours, Am. Compl. ¶ 15; and (6) several members of Raytheon management dissuading plaintiff from filing a formal complaint about Hinckley's conduct, Phillips Aff. ¶¶ 12–14.[21] For the reasons outlined below, the majority of these allegations cannot, as a matter of law, support plaintiff's hostile work environment claim. And, the allegations that remain are insufficient to support a finding that the harassment was sufficiently "severe and pervasive" so as to trigger liability. Finally, even if plaintiff's evidence could support a finding of severe and pervasive harassment, no basis exists on these facts to hold Raytheon liable.

Plaintiff surmises, based on the Interim Performance Review she received from Hinckley, that Hinckley viewed her as an "uppity negro." Phillips Aff. ¶ 18. As noted, the second element of a hostile work environment claim requires the plaintiff to prove at trial that the alleged harassment occurred "because of" her race. In my view, a reasonable jury could not conclude that Hinckley's inclusion of a bulleted list of generic character traits and skills was racially motivated. The Interim Performance Review as a whole is overwhelmingly positive and makes no mention of plaintiff's race. *See* Interim Performance Review at 1–3. Moreover, plaintiff's

---

[21] As an African-American female, plaintiff is a member of two protected classes: race and gender. I analyze both hostile environment claims together. *See Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 336 (4th Cir. 2010) ("[A] hostile work environment claim can be bolstered by relying on evidence of a workplace tainted by both sex and racial discrimination.").

suggestion that Hinckley had an illicit motive in including the list, or that the list itself was racially offensive, is implausible considering that the list was adopted nearly verbatim from a book on leadership written by John Zenger and Joseph Folkman. *See* Reply at 16; Zenger & Folkman, *The Extraordinary Leader* (American Media International 2007).[22] No reasonable jury could conclude that the inclusion of this innocuous list of traits was in any way related to plaintiff's race.

Plaintiff also claims that Raytheon "forced" her to report to Hinckley because of gender animus. As an initial matter, Raytheon transferred plaintiff from Hinckley's supervision shortly after she filed her complaint. Even if the four-month span between plaintiff's complaint and her transfer was excessive, plaintiff offers no evidence, other than her own speculation, that this four-month "delay" was in any way related to her gender or that any manager with authority to approve such a transfer harbored gender animus. *See Mackey v. Shalala,* 360 F.3d 463, 470 (4th Cir. 2004). ("An employee's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case.").

Moreover, Raytheon's actions in the days immediately following plaintiff's complaint cut the legs out from under plaintiff's contention that Raytheon acted with animus. Shortly after plaintiff requested that Hinckley be formally censured and required to undergo sensitivity training, s*ee* Mot. Ex. 34 (ECF 44-36) at 3; Opp. Ex. 25 (ECF 47-25) at 3, Raytheon granted both of plaintiff's requests. *See* Mot. Ex. 35 (ECF 44-37) at 1; Leonelli Dep. at 23:18–24:10; Ross-Sinkler Dep. at 22:9–24; 24:25–25:4. Indeed, Raytheon took Hinckley to the proverbial

---

[22] Although defendant asserts that the list is adopted from a different book by Zenger and Folkman, *The Inspiring Leader*, *see* Reply at 16, I take judicial notice that the list actually appears in *The Extraordinary Leader*. The precise book is not material, however.

woodshed in its memorandum of April 7, 2008, discussed earlier. *See* Mot. Ex. 35. It castigated

him as to plaintiff's complaints and reminded him of the company's policy as to appropriate

behavior. *Id.* It directed that Hinckley review Raytheon's policy and acknowledge doing so. *Id.*

And, it expressed in no uncertain terms that it would "exhibit zero tolerance" for further

misconduct. *Id.* In short, plaintiff has presented no evidence of gender animus by the members

of upper management or of any discriminatory company policy. Thus, a reasonable jury could

not conclude that any delay in plaintiff's transfer was motivated by gender animus.

Plaintiff's assignment to a new office cannot support her hostile work environment claim

because it was not unsolicited. The evidence shows that plaintiff asked not to be located near

Hinckley. *See* Phillips Dep. at 201:9; 202:6–12; Mot. Ex. 37 (ECF 44-39) at 3. Raytheon

obliged by moving Phillips' office. That Raytheon could have moved Hinckley instead of

Phillips does not give rise to an inference of hostile work environment.

Plaintiff also failed to offer any evidence from which a reasonable jury could conclude

that Robinson's request that she reduce her workweek to 32 hours was in any way related to her

gender or race. Plaintiff's mere speculation as to Robinson's motive or intent is not sufficient to

defeat summary judgment. *See Mackey,* 360 F.3d at 470.

The only allegations remaining to support plaintiff's hostile work environment claim are

a series of insults made by Hinckley between April 2007 and December 2007, and the attempts

of Robinson, Leonelli, and Cottrell to dissuade plaintiff from filing a complaint with HR. This

sporadic, mild, non-threatening, and largely gender-neutral conduct does not, as a matter of law,

meet the "high bar" required to survive summary judgment on a hostile environment claim. *See*

*EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).

In particular, plaintiff identified seven incidents in which Hinckley insulted her during the course of her seventeen months of active employment.[23]  According to plaintiff, Hinckley referred to her as "dumb," "stupid," "ignorant," "situational," and "overpaid," and told her that other men thought she was a "bitch."  *See* Phillips Aff. ¶¶ 4–5.  Plaintiff ascribes these insults to gender animus.  *See* Phillips Dep. at 135:14–17 (agreeing that Hinckley insulted plaintiff "not necessarily because of [her] race, but because of [her] gender."), 138:1–3 ("[T]his is a male/female thing; Bob Hinckley and myself.  That's what it is about."); Opp. at 27 ("Candidly, there is scant evidence of race discrimination.").

Hinckley's behavior cannot automatically be considered sex-based simply because he is male and plaintiff is female.  *Cf. Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000) ("Law does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion.").  Indeed, plaintiff admits that Hinckley was on good terms with other females in the workplace.  *See, e.g.*, Phillips Dep. 151:19–20 ("She was a woman.  He liked her a lot.").  Although plaintiff has provided evidence that working with Hinckley may have been unpleasant and challenging, plaintiff offered no evidence, other than her own speculation, that Hinckley's behavior was due to his gender animus (and she has provided even less evidence by which his conduct could be imputed to Raytheon).  *See, e.g., Combs–Burge v. Rumsfeld*, 170 Fed. App'x. 856, 862 (4th Cir.

---

[23] Throughout its Memo and Reply, Raytheon states that plaintiff's claim is premised on only three incidents of improper statements by Hinckley.  *See, e.g.*, Memo at 15.  However, plaintiff proffers evidence of seven such incidents.  Specifically, she states that at some point between April and June 2007, Hinckley told her that other men thought she was a "bitch," Phillips Chart at 2; that Hinckley insulted her intelligence on four separate occasions in May and June 2007, *id.*; that in October 2007 Hinckley made a comment that Phillips was overpaid, *id.* at 3; and that Hinckley told an offensive story at a Christmas lunch in December 2007.  *Id.*

2006) ("[A]lthough [plaintiff] alleges that [her supervisor] was more friendly to white employees than to her, general complaints of rude treatment are not sufficient to sustain a hostile work environment claim."). Indeed, plaintiff's deposition testimony is rife with admissions that Hinckley's conduct was motivated by factors *other* than gender animus. For example, plaintiff attributes her clashes with Hinckley to her higher rank in the military, Phillips Dep. at 153:18–154:12; power struggles between plaintiff and Hinckley, *id.* at 132:19–22, 215:17–216:5; and incidents in Hinckley's personal life, *id.* at 133:18–134:3.

In my view, the alleged harassment was far less frequent and less severe than in many of the cases that have survived summary judgment in this Circuit. *See, e.g.*, *Mosby-Grant*, 630 F.3d at 335 ("constant use of sexist language and disparaging remarks about women," causing plaintiff to "regularly leav[e] work in tears"); *Cent. Wholesalers*, 573 F.3d at 176 (workplace permeated with "habitual" use of epithets, pornography, and dolls hanging by nooses); *Sunbelt Rentals,* 521 F.3d at 316 (harassment was "persistent, demeaning, unrelenting, and widespread"); *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 697 (4th Cir. 2007) (defendant engaged in constant, open discussion of his sexual fantasies and the sex lives of the plaintiff and her teammates). It is also worth noting that, unlike the plaintiffs in many of the sex discrimination cases cited by Phillips, she has not alleged any unwelcome sexual contact, sexual propositioning, or sexual innuendo. *See, e.g.*, *Smith v. Norwest Fin. Acceptance Inc.*, 129 F.3d 1408 (10th Cir. 1997) (defendant stated that plaintiff "would be the worst piece of ass that I ever had," and that she "must be a sad piece of ass" who "can't keep a man"); *Tomka v. Seiler Corp*., 66 F.3d 1295 (2d Cir. 1995) (plaintiff alleged that co-worker sexually assaulted her); *Ellison v. Brady*, 924

F.2d 872 (9th Cir. 1991) (defendant told plaintiff he had been "watching" and "experiencing" her and made repeated references to sex).

To be sure, the "severe and pervasive" inquiry is not "a mathematically precise test," *Harris*, *supra*, 510 U.S. at 22, and is often a question for the jury. But, the sporadic and largely gender-netural comments of Hinckley, even when paired with the alleged behavior of Robinson, Leonelli, and Cottrell, do not meet the high bar required to proceed with a hostile work environment claim under Title VII. *See, e.g.*, *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006) (stating that rude treatment by supervisors is "conduct falling short of that required to sustain a hostile work environment claim"). Put differently, no reasonable jury could find that plaintiff suffered from severe and pervasive harassment on the basis of her sex or race.

Even if plaintiff had adduced sufficient evidence to support a finding that she experienced severe and pervasive sex-based harassment, no basis exists for imposing liability upon Raytheon. As noted, an employer is strictly liable for a supervisor's harassment when the supervisor takes a "tangible employment action" against the harassed employee. *Ellerth*, 524 U.S. at 762. If the harassing supervisor played no role in any subsequent tangible employment action, however, "the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, *supra*, ___ U.S. ___, 133 S. Ct. at 2439; *accord Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

As discussed, plaintiff has not adduced evidence from which a jury could infer that Hinckley's alleged conduct or animus played any role in plaintiff's termination. Accordingly,

Raytheon is entitled to proceed with the affirmative defense described in *Vance*, *Faragher*, and *Ellerth.* As to the first element of the affirmative defense—whether the employer exercised reasonable care to prevent and correct the harassment—the record amply reflects that Raytheon acted promptly and diligently after plaintiff filed her complaint with the company's HR department. In the days after Phillips filed her first formal complaint with HR, Raytheon conducted a series of meetings in which Phillips and Hinckley were asked to share their thoughts and concerns with Leonelli, Robinson, Cottrell, Ross-Sinkler, and Mallam. *See* ECF 44-36. At the third meeting, Phillips stated that she wanted Hinckley to undergo sensitivity training and to be formally censured. *Id.* at 2. As plaintiff requested, Cottrell issued a harsh admonishment to Hinckley in the memorandum of April 7, 2008. *See* Mot. Ex. 35, ECF 44-37. Raytheon also provided sensitivity training to him and the rest of the office. Leonelli Dep. 23:18–24:10; Ross-Sinkler Dep. 22:9–24, 24:25–25:4. And, four months later, Raytheon transferred Phillips from Hinckley's department to Glover's department. ECF 47-26. After this transfer, Phillips made no further complaints about Hinckley. At her deposition, Phillips acknowledged: "Bob Hinckley was out of the picture." Dep. at 218:6–8; *see Xerxes*, 639 F.3d at 669 (4th Cir. 2011) ("'A remedial action that effectively stops the harassment will be deemed adequate as a matter of law.'" (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 411–12 n. 8 (3d Cir. 1997))); *Howard v. Winter*, 446 F.3d 559, 571 (4th Cir. 2006) ("[W]hen an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well"). Accordingly, Raytheon has made out the first element of its affirmative defense.

Raytheon has also met its burden as to the second element. Evidence that the plaintiff failed to utilize the company's complaint procedure "will normally suffice to satisfy the

defendant's burden under the second element of the defense." *Ellerth*, 524 U.S. at 765; *accord Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 341 (4th Cir. 2006) ("[W]e have held that employers are not liable for an employee's unlawful harassment of another employee if the harassed employee has unreasonably refused to report or has unreasonably waited many months before reporting a case of actual discrimination."); *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 269–70 (4th Cir. 2001) (defendant established affirmative defense where plaintiff did not report harassment for three months).

Phillips failed to report the alleged harassment to HR until March 28, 2008, at least nine months after Hinckley's first comments and almost six months after the incident with the allegedly hidden document. *See* Phillips Aff. ¶¶ 4, 5, 12; Phillips Chart at 2–4. In fact, at the time she filed her complaint, Hinckley had not engaged in any allegedly improper conduct toward her for nearly four months. Phillips Chart at 3. Moreover, in January 2008, Robinson requested that Phillips provide him with input for Hinckley's annual performance appraisal, ECF 47-30, but Phillips failed to do so, *see* Robinson Dep. at 27:20–29:5. Had Phillips responded to Robinson's request, Raytheon would have learned of, and perhaps been able to prevent, the alleged harassment three months earlier than it did. *See Howard*, 446 F.3d at 567 ("[A]n employee may not impute liability on an employer under a theory that the employer must exercise an all-seeing omnipresence over the workplace."). Accordingly, Raytheon has shown that plaintiff unreasonably failed to take advantage of preventive or corrective opportunities.

In sum, plaintiff has not adduced sufficient evidence to support a finding that she experienced "severe and pervasive" harassment. And, even if she did, there is no basis to impute

liability to Raytheon.  Accordingly, I will grant summary judgment to Raytheon on Counts III and IV of plaintiff's Amended Complaint.

### 3. Retaliation (Count V)

Plaintiff alleges that Raytheon took several actions against her in retaliation for her filing of an HR complaint about Hinckley.  Specifically, she alleges that Raytheon refused to transfer her to another supervisor; Raytheon gave her "only" a 3% raise; Hinckley moved plaintiff into a separate office; Hinckley instructed plaintiff not to attend group meetings; plaintiff's job responsibilities were changed; Hinckley prepared a derogatory evaluation; Robinson prepared a derogatory evaluation; Raytheon failed to assist the plaintiff in maintaining her security clearance ("lifestyle polygraph");[24] and plaintiff was terminated.  *See* Opp. at 22–26.  Raytheon responds by arguing that most of these incidents do not constitute "materially adverse actions," and that "no causal connection exists between Phillips's complaint to Human Resources and her termination."  Memo at 26.

"Title VII prohibits an employer from retaliating against an employee who exercises his Title VII rights." *Thorn v. Sebelius*, 766 F.Supp.2d 585, 600 (D. Md. 2011).  The purpose of Title VII's antiretaliation provision is to "[m]aintain[] unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

In order to establish a prima facie claim of retaliation under Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the

_____

[24] "A lifestyle polygraph is a high-level security clearance.  A party may only acquire this clearance by being sponsored by her employer for work on a project that requires the clearance." Campbell Decl. ¶ 26.

EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli*, 648 F.3d at 223 (citations omitted); *see Price v. Thompson*, *supra*, 380 F.3d at 212. "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's Casino,* 446 F.3d 541, 551 (4th Cir. 2006)).

As indicated, the plaintiff must establish that she engaged in protected activity, such as filing a complaint with the EEOC. *Okoli*, 648 F.3d at 223–24. As the Fourth Circuit has explained, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998). Here, it is undisputed that plaintiff's complaint to the Human Resources Department qualifies as a protected activity.

The standard for "adverse employment action," the second element of the prima facie case, is more lenient for retaliation claims than for substantive discrimination claims. *Burlington Northern*, *supra*, 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). A plaintiff need only show that the challenged action "might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted). Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist*, *supra*, 671 F. Supp. 2d at 738 (quoting *Burlington Northern*, 548 U.S. at 68).

To satisfy the third element—a causal connection between the protected activity and the adverse action—a plaintiff must show that "the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). The Fourth Circuit "has held that evidence that the alleged adverse action occurred *shortly* after the employer became aware of the protected activity is sufficient to 'satisf[y] the less onerous burden of making a prima facie case of causa[tion].'" *Dowe*, *supra*, 145 F.3d at 657 (quoting *Williams*, *supra*, 871 F.2d at 457) (emphasis and alterations in *Dowe*). Conversely, "the opposite [is] equally true," so that "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Dowe*, 145 F.3d at 657 (finding a period of time exceeding three years too lengthy to give rise to the inference of a causal connection).

For a variety of reasons, none of plaintiff's allegations of retaliation are supported by sufficient evidence to survive summary judgment. First, plaintiff entirely fails to support some of her allegations. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion . . . ."). In particular, plaintiff's claim that she was retaliated against when she received "only" a 3% raise fails because plaintiff has not offered any evidence to suggest that it was adverse. On its face, a pay increase is not adverse, and plaintiff has not

produced any evidence whatsoever to suggest that her 3% pay increase differed in any way from increases received by her co-workers. *See Celotex*, *supra*, 477 U.S. at 322–23 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  Similarly, plaintiff fails to provide any evidence that she was ever in possession of a lifestyle polygraph, that Raytheon was aware that she was in possession of a lifestyle polygraph, or that Raytheon agreed to maintain her lifestyle polygraph.  *See* Phillips Dep. 45:9–16, 48:13–17.  As a result, her claim that Raytheon took adverse action related to her lifestyle polygraph cannot survive summary judgment.  *See Celotex*, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

Next, some of the alleged actions Raytheon took against plaintiff are not "materially adverse."  For example, plaintiff's exclusion from group meetings was not materially adverse, as "mere exclusion from meetings—absent any tangible, corresponding injury—is not conduct that would dissuade a reasonable worker from making or pursuing a charge of discrimination." *Wilcoxon v. DECO Recovery Mgmt., LLC*, 925 F. Supp. 2d 725 (D. Md. 2013) (quoting *Alexander v. Marriott Int'l Inc.*, 2011 WL 1231029 at *9 (D. Md. Mar. 29, 2011)).  Plaintiff fails to allege that any tangible injury resulted from her exclusion from the meetings, and even concedes that Hinckley kept her apprised of any developments that took place.  S*ee* Phillips Chart at 5 ("Bob H would come and tell me what he wanted me to know about the meetings!").

Nor was Hinckley's Interim Performance Review materially adverse. As discussed, *supra*, the performance review was overwhelmingly positive. A reasonable employee could not interpret a positive review as adverse or be dissuaded from making a charge of discrimination based on it. *See Shoffner v. Talecris Biotherapeutics, Inc.*, 5:10-CV-406-FL, 2012 WL 525550 (E.D.N.C. Feb. 16, 2012) (receipt of a performance rating of "Achieves Expectations" not materially adverse).

Likewise, the alleged change in plaintiff's responsibilities when she was transferred to Eric Glover's department was not materially adverse because the change had no effect on plaintiff's level of responsibility, title, hours, pay, or benefits. *See* Phillips Dep. at 199:20–200:12; *see also Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 784 (D. Md. 2010) ("[A] change in job responsibilities . . . does not constitute a materially adverse action if the new tasks 'are not dirtier, more arduous, less prestigious, . . . objectively inferior, [or] possess[ing] [of] any analogous attribute.'" (quoting *Stephens v. Erickson,* 569 F.3d 779, 791 (7th Cir. 2009)). Moreover, even if the change was materially adverse, there is no basis from which a jury could disbelieve Raytheon's evidence that Phillips was transferred to separate her from Hinckley, her alleged harasser. *See* Glover Dep. 12:19–22. Plaintiff appears to concede the point. At her deposition, she said: "I think it came from higher-ups. I think they were trying to separate us." Phillips Dep. at 200:17–19.

Similarly, plaintiff has not cast any doubt on Raytheon's evidence that her office was relocated to separate her from Hinckley. *See* Glover Dep. 12:19–22. Plaintiff admits that she asked to be separated from Hinckley and admits that the relocation of her office accomplished that objective. Phillips Dep. at 175:6–9, 200:21–202:12. What seems to irk plaintiff is that

Raytheon chose to move her, rather than Hinckley. *See* Phillips Dep. at 175:6–175:9 ("And, technically, I asked for Bob to be removed from us. I didn't request that I be the one who moved. I actually thought it made more sense for him to be removed."). But, plaintiff cites no authority for the proposition that an employer must take the precise corrective action desired by a harassed employee.[25]

Further, plaintiff's allegation that Raytheon "forced" her to report to Hinckley is overstated. Raytheon transferred plaintiff to Glover's supervision a mere four months after her complaint. Plaintiff has offered no evidence from which a jury could conclude that this four-month span was in any way retaliatory.

As to her final two claims, plaintiff fails to adduce sufficient evidence to support a finding of a causal connection between her protected activity and the adverse action. There is no basis to conclude that Robinson's performance review was causally connected to her HR complaint because the review is largely consistent with a review plaintiff received *prior* to filing her HR complaint. *See, e.g.*, *Jyachosky v. Winter*, 343 F. App'x 871, 876 (4th Cir. 2009) (documentation of performance problems prior to EEOC complaint indicates "that these problems were not manufactured after her dismissal to serve as a pretext."); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[W]hen an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show

---

[25] Raytheon quotes *Whitten v. Fred's Inc.*, 601 F.3d 231, 243 (4th Cir. 2010), as stating that an employer "has no responsibility to engage in the specific corrective action preferred by the employee." Raytheon Reply at 14–15. I found no such quote, or any similar passage, in that opinion.

causation.").  Both reviews note plaintiff's lack of flexibility, her tendency to interpret events as being personal attacks on her character, and her frequent absences from the office.  *Compare* Opp. Ex. 11 (ECF 47-11) *with* Opp. Ex. 13 (ECF 47-13).  Because these criticisms predate plaintiff's complaint to HR, a reasonable jury could not conclude that they are causally connected to that complaint.  Moreover, even if the reviews were as inconsistent as plaintiff makes them out to be, *see* Opp. at 10–11, a jury would have no basis from which to conclude that the differences were attributable to retaliation.

Finally, plaintiff's assertion that her termination was an act of retaliation fails because there is no basis to infer a causal connection between her termination and her HR complaint.  To establish a causal connection, plaintiff appears to rely solely on the temporal proximity between her complaint and her termination, which were separated by nine months.  *See* Opp. at 22.  To be sure, temporal proximity may establish an inference of retaliation.  But, the Supreme Court has recognized that when a plaintiff relies solely on "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . the temporal proximity must be 'very close.'"  *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation omitted).  And, Fourth Circuit precedent (indeed, the cases on which plaintiff relies) makes clear that nine months, by itself,  is not close enough to generate an inference of discrimination.  *See, e.g.*, *Price*, 380 F.3d at 209 ("We are also mindful, however, of the fact that generally the passage of time (nine to ten months in this case) tends to negate the inference of discrimination."); *Pascual v. Lowe's Home Centers, Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) ("In this case, at least three to four months separated the termination of Pascual's employment

and the claimed protected activities.  We find that this time period is too long to establish a causal connection by temporal proximity alone.").

In sum, plaintiff alleges that the following sequence of events took place after she filed a complaint with HR:  Raytheon management held numerous meetings to discuss plaintiff's claims, sanctioned Hinckley, provided sensitivity training to the entire department, transferred plaintiff out of Hinckley's division, gave her a 3% raise, granted her 12 weeks of paid FMLA leave, granted her an additional four weeks of paid leave, *and then* terminated plaintiff in retaliation for the complaint she had filed nine months earlier.  In my view, a reasonable jury could not find that plaintiff's termination, or any other action taken against her, was retaliatory within the meaning of Title VII.  Accordingly, I will grant summary judgment to Raytheon with respect to Count V.

## B. FMLA Claim (Count VI)

Plaintiff asserts that Raytheon interfered with her rights under the FMLA by failing to reinstate her to the same position she occupied before she took medical leave.  In addition to defending on the merits, Raytheon argues that plaintiff's FMLA claim is time-barred.  Memo at 38–40.  Plaintiff has not offered a response regarding the timeliness of her claim.

In general, FMLA claims are subject to a two-year statute of limitations.  29 U.S.C. § 2617(c)(1).  For willful violations of the FMLA, the limitations period extends to three years. *Id.* § 2617(c)(2).  Because plaintiff filed her suit more than two years after her termination, but less than three years after she was discharged, her claim is time-barred unless she has proffered evidence from which a jury could conclude that Raytheon willfully violated the FMLA.

The term "willful" is not defined in the FMLA, but courts have consistently interpreted it to require that the employer "knew or showed reckless disregard" that its conduct violated the FMLA. *See, e.g.*, *Porter v. New York Univ. Sch. of Law*, 392 F.3d 530, 532 (2d Cir. 2004); *Ricco v. Potter,* 377 F.3d 599, 602–03 (6th Cir. 2004); *Hillstrom v. Best Western TLC Hotel,* 354 F.3d 27, 33–34 (1st Cir. 2003); *Bosse v. Baltimore Cnty.*, 692 F. Supp. 2d 574, 583 (D. Md. 2010). As Judge Motz has noted:

> Courts applying this standard have required more than mere negligence, *see Porter v. N.Y. Univ. Sch. of Law*, 392 F.3d 530, 531–32 (2d Cir. 2004) (citing *McLaughlin,* 486 U.S. at 135 n. 13), and have found no willfulness where the employer granted the employee's request for leave. *See Samuels v. Kan. City Mo. Sch. Dist.*, 437 F.3d 797, 804 (8th Cir. 2006); *Edwards v. Ford Motor Co.*, 179 F.Supp.2d 714, 719–20 (W.D. Ky. 2001). Attempts to accommodate an employee's disability or condition also indicate a lack of willfulness on the employer's part. *See Samuels*, 437 F.3d at 804; *Passauer*, 2004 WL 865829, at *2. Moreover, an employer that supplies the necessary FMLA forms, follows up with the employee regarding insufficient paperwork, and keeps the employee apprised of the application's status cannot be said to have willfully violated the statute. *See Porter v. N.Y. Univ. Sch. of Law*, No. 99 Civ. 4693(TPG), 2003 WL 22004841, at *6–8 (S.D.N.Y. Aug. 25, 2003); *Edwards*, 179 F.Supp.2d at 720.

*Honeycutt v. Baltimore County, Maryland*, Civ. No. JFM-06-0958, 2007 WL 1858691 at *3 (D. Md. June 18, 2007), *aff'd*, 278 F. App'x 292 (4th Cir. 2008).

It is undisputed that Raytheon granted plaintiff's request for leave, provided plaintiff with the necessary FMLA forms, notified her that a doctor's note would be required for reinstatement, placed her on paid leave during the period between the expiration of her 12-week FMLA leave and her medical clearance, granted her paid personal leave for four additional weeks, and made at least some effort to find her a new position within the company. Under these circumstances, I conclude that any FMLA violation was not willful. Accordingly, the two-year statute of limitations applies. Because plaintiff did not file her Complaint until more than two years after

her employment was terminated, *see* ECF 1, her FMLA claim is barred.  Accordingly, I will grant summary judgment to Raytheon as to Count VI.

## CONCLUSION

For the foregoing reasons, summary judgment will be granted in favor of defendant.  A separate Order, consistent with this Memorandum, follows.


Date: September 27, 2013                              _____/s/_____
                                                      Ellen L. Hollander
                                                      United States District Judge